[No. 31868.   Department One.   April 3, 1952.]

GEORGE FEDLAND, *Appellant,* v. LEE A. TESHERA, *Respondent.*[1]

*Pemberton & Orloff,* for appellant.

*Abrams, McCush & Rinker,* for respondent.

DONWORTH, J.—This action was brought by a pedestrian to recover for personal injuries sustained when he was struck by an automobile while walking on a crosswalk at a controlled intersection in Bellingham.

[1] Reported in 242 P. (2d) 751.

A trial was had before a court and jury. When plaintiff rested his case, the defendant challenged the sufficiency of the evidence and moved for a nonsuit on the ground that plaintiff's evidence showed that he was guilty of contributory negligence as a matter of law, which was the proximate cause of his injuries. The trial court sustained the challenge and discharged the jury. A judgment dismissing plaintiff's action was thereafter entered. Plaintiff's motion for a new trial was denied. From the judgment of dismissal, plaintiff has appealed.

The testimony produced by appellant at the trial, which, for our present purposes, must be considered as true, showed the following facts:

The accident occurred April 14, 1950, at about 9:30 p. m., at the intersection of Cornwall avenue and Holly street, which is the busiest intersection in Bellingham. Cornwall avenue runs north and south intersecting Holly street, which runs east and west. Each street is about fifty feet wide from curb to curb. A traffic light is suspended in the center of the intersection, which changes from red to green and then to red. There is no amber light. The record does not disclose the interval between changes. At the time of the accident, the pavement was wet from a recent shower.

Appellant, a bachelor sixty-six years of age (but older in appearance), was walking south on the sidewalk on the east side of Cornwall avenue. When he reached Holly street, at the northeast corner of the intersection (referred to as the Bellingham National Bank corner), he stopped and waited for the traffic light to change.

His testimony regarding the traffic light, on direct examination, was:

"Q. Now let's come up to the time of the collision. Will you tell the jury exactly how you crossed the street there as far as the lights go? A. The light? I come to the Bellingham National Bank and the red light was to go for them fellows, so I stopped there until the red light, 'till it went out, and then—no, until the green light went out and the red light come up, and then I started. Q. Is that the way

you always cross it? A. Yes. Q. Did you do it the same as always? A. Always see the red light come up, I always cross. That is what everybody do. Q. I mean, you walk the same as all the other people? A. Yes, all the other people I cross. [The court sustained respondent's objection to the last question.] . . .

"Q. Well, I don't want to be in a position, Your Honor, of telling the witness what to say. Do you mean that you crossed the street, started across, when the lights were red stopping the cross-traffic; is that what you mean? A. Yes, that is what I mean. Q. That is what you mean? A. Yes."

On cross-examination, he further testified as to the traffic light:

"Q. That is, you were figuring on crossing Holly Street, going south, is that right? A. Yes. Q. All right. Then as you stood there you came up to the intersection and what was the signal in the middle of the street; how did it show? A. The signal was — was — it was green for them fellows to go, and I stand there until it turned. It turned, and then the red light come up, and then I started to go. Q. That is, when you first came up there the signal was green? A. Yes. Q. And you waited until it turned red and then you started across the street? A. Yes, to cross. That is what everybody do now."

When the light changed, appellant continued south across Holly street on the crosswalk (15 feet wide) at his usual gait toward the southeast corner of the intersection (referred to as the Seattle-First National Bank corner). He believed he had the right of way over cars. When he was about ten feet from the sidewalk on the opposite side of Holly street, he was struck on his right hip by the right front fender of respondent's car and was knocked unconscious. He sustained painful injuries as the result of the accident.

The chief of police, who happened to be a few feet away from the scene of the accident, heard a noise and went to investigate. He saw appellant (whom he had known for some time) lying on the pavement with his head next to the curb. He located appellant's position on a map of the intersection as being near the light standard at the sidewalk's edge, at the southeast corner of the intersection. Appellant

was on the pedestrian crosswalk when respondent's car struck him. The chief called an ambulance and sent appellant to the hospital.

Respondent was called as an adverse witness and gave his version of the accident. He was in his car, which was standing on Holly street at a point eighty-three feet west of the point of impact. His car was facing east waiting for the traffic light to change from red to green. Another automobile (referred to as car X) was standing beside his car on his left. When the green light came on, both cars started straight ahead across Cornwall. Respondent was moving between fifteen and eighteen miles per hour as he approached the pedestrian crossing on the east side of Cornwall avenue. Car X, on his left, had pulled a little ahead of his car.

Respondent first saw appellant when the latter was walking in front of car X directly into respondent's path. Appellant was then about fourteen feet from respondent's car. Respondent applied his brakes and skidded five to six feet. His right front fender struck appellant, knocking him toward the curb near the light standard mentioned by the chief of police.

Appellant again took the stand and testified that respondent had visited him in the hospital two or three days after the accident. On that occasion, respondent said that the accident was his fault and he would take the blame. Respondent would not deny this conversation, but said he did not remember "reconstructing the scene at all."

In granting respondent's motion for a nonsuit, the trial court stated:

"Well, I am going to grant the motion on the ground and for the reason that the plaintiff was contributorily negligent as a matter of law in stepping off the curb when the green light was not in his favor, and also I believe from the testimony that negligence was a proximate cause of his injuries. The record may show an exception."

Appellant's assignments of error are stated in his brief as follows:

"The trial court erred in the following particulars:

"1. In holding as a matter of law that appellant was contributorily negligent, which negligence proximately caused his injuries and damages.

"2. In granting respondent's motion for a nonsuit.

"3. In entering judgment for respondent.

"4. In denying appellant's motion for a new trial."

The single question presented by these assignments is whether the evidence produced by appellant was sufficient to make out a *prima facie* case against respondent. If, as the trial court held, appellant started across Holly street when the traffic light was not in his favor, the judgment must be affirmed.

Appellant's testimony on this vital point is quite confusing, in spite of the attempts of the court and both counsel to straighten him out. However, we must apply the rule that on a motion for nonsuit the party making the motion admits the truth of the evidence presented by his opponent and all inferences that reasonably can be drawn therefrom. Furthermore, the evidence must be interpreted in the light most favorable to the party against whom the motion is made. *Fiskaa v. Miller,* 27 Wn. (2d) 242, 177 P. (2d) 707; *Kellerher v. Porter,* 29 Wn. (2d) 650, 189 P. (2d) 223; *Williams v. Hofer,* 30 Wn. (2d) 253, 191 P. (2d) 306; *Bleyhl v. Tea Garden Products Co.,* 30 Wn. (2d) 447, 191 P. (2d) 851; *Rowe v. Dixon,* 31 Wn. (2d) 173, 196 P. (2d) 327.

Applying these principles of law to the present case, we think that appellant's persistence in testifying that he started with the red light instead of the green was the result of his own peculiar way of expressing himself. Appellant had never driven an automobile and had only a pedestrian's experience with traffic signals. There are several rather strong indications in his testimony that when he said he started with the red light he was referring to the red light facing traffic on Holly street and not the red light facing traffic on Cornwall avenue. In other words, he started across the pedestrian crosswalk on Holly street when the traffic signal had stopped all traffic *on Holly street.*

For example, he testified that the way he crossed Holly street on the evening of the accident was the way he always crossed the street. He also said "that is what everybody do." These statements could only reasonably be interpreted to mean that he crossed in a lawful manner. We cannot indulge in the presumption that appellant, and pedestrians in Bellingham in general, always violated the traffic laws in crossing at a controlled intersection. We are bound to interpret the evidence most favorably to appellant and most strongly against respondent.

Another example of appellant's peculiar mode of expression: When he approached the northeast corner of the intersection preparatory to crossing Holly street, he testified that "the red light was to go for them fellows." That he meant by this statement that the light was red on Cornwall avenue permitting traffic on Holly street ("them fellows") to proceed is shown later in his testimony when his counsel asked him:

"Q. Well, I don't want to be in a position, Your Honor, of telling the witness what to say. Do you mean that you crossed the street, started across, when the lights were red stopping the cross-traffic; is that what you mean? A. Yes, that is what I mean. Q. That is what you mean? A. Yes."

The statutory provisions for regulating traffic at controlled intersections is found in Rem. Supp. 1949, § 6360-98, the applicable portion of which reads as follows:

"Whenever, at any point, traffic is controlled by traffic control signals exhibiting the words 'Go,' 'Caution,' or 'Stop,' or exhibiting different colored lights, the following words or colors only shall be used and shall indicate as follows:

"Green or the word 'Go': Vehicular traffic facing the signal except when prohibited by a superior regulation, may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. But vehicular traffic, including vehicles turning right or left, shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection or an adjacent cross walk at the time such signal is exhibited. Pedestrians facing the signal may proceed across the roadway within any marked or unmarked cross walk unless directed otherwise by a pedestrian signal."

Viewing the testimony produced by appellant in the light most favorable to him and most strongly against respondent, we are of the opinion that appellant proceeded in the exercise of the right of way accorded him by the above-quoted statute. We consider it reasonable to infer from his testimony that he started across the crosswalk when the traffic signal was red against respondent on the Holly street side and was in his favor on Cornwall avenue.

■ Since he started with the signal in his favor, by the provisions of § 6360-98, quoted above, he had the right of way over vehicular traffic on Holly street. We are of the opinion that, as he continued across in the pedestrian lane at his usual gait, he retained that statutory right of way until he reached the opposite corner, even if meanwhile the signal changed releasing vehicular traffic on Holly street.

Respondent argues that, even if appellant entered the intersection with the green light in his favor, the evidence shows that he failed to use ordinary care for his own safety in that he failed to look out for vehicles while crossing Holly street. In support of this argument, respondent cites *Miller v. Edwards*, 25 Wn. (2d) 635, 171 P. (2d) 821, and several other decisions of this court. In none of these cases did the accident happen at a controlled intersection, and therefore they have no application here.

Although appellant's testimony was confused as to whether he watched for vehicles while crossing Holly street, we must view his testimony in the light most favorable to him. Appellant did state on cross-examination that he looked but did not count the number of cars. We cannot find from the evidence that he failed to look, and it is not necessary, therefore, to determine whether failure to look under the circumstances of this case would constitute contributory negligence as a matter of law.

■ From our examination of the evidence produced by appellant, we hold that he was not guilty of contributory negligence as a matter of law which was the proximate cause of his injuries and that appellant produced sufficient

evidence of negligence on the part of respondent to carry the case to the jury.

The trial court erred in granting respondent's motion for a nonsuit upon the ground stated in its oral opinion.

In view of the conclusion we have reached, the judgment of the trial court must be and it is reversed, and the cause is remanded with instructions to vacate the judgment of dismissal. It follows that a new trial must be granted and it is so ordered.

SCHWELLENBACH, C. J., MALLERY, GRADY, and WEAVER, JJ., concur.