IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THYCE W. COLYN and AMY J. COLYN, individually and as husband and wife, | ) ) ) ) ) | No. 76425-0-I<br><br>DIVISION ONE |
| Respondents, | ) ) ) | |
| v. | ) ) ) | |
| STANDARD PARKING CORPORATION, a Foreign Corporation; TAYLOR WARN, individually; and UNKNOWN JOHN DOES, | ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Appellants. | ) ) ) | FILED: January 22, 2019 |

SCHINDLER, J. — While driving across a one-way two-lane street, Standard Parking Corporation valet Taylor Warn collided with bicyclist Thyce Colyn. There is no dispute Warn had a duty to yield and Thyce Colyn had the right-of-way. Thyce and Amy Colyn filed a personal injury lawsuit against Standard Parking and Warn. At the conclusion of the evidence, the court granted the plaintiffs' motion for judgment as a matter of law on the negligence of Warn and the failure to prove contributory negligence. The court instructed the jury that the negligence of Warn was established as a matter of law and Standard Parking was liable for the negligence of Warn. The court instructed the jury that Thyce Colyn was not negligent. The jury awarded Thyce

Colyn $7,259,238 for past and future economic damages, $4 million for past noneconomic damages, and $16 million for future noneconomic damages. The jury awarded Amy Colyn $2 million for past loss of consortium and $9 million for future loss of consortium. Standard Parking and Warn appeal the judgment on the verdict and the order denying the motion for a new trial. We affirm.

## FACTS

Standard Parking Corporation provides valet service for the Grand Hyatt Seattle hotel located at 721 Pine Street. Taylor Warn worked as a valet driver for Standard Parking.

In 2012, the valets parked the cars of Grand Hyatt Seattle hotel guests at the Olive 8 parking garage located at 1635 Eighth Avenue. Eighth Avenue is a one-way two-lane northbound street. A painted bicycle symbol marks the right northbound lane as a shared car and bicycle lane.

Instead of driving northbound on Eighth Avenue to return a car to the Grand Hyatt, the valets used a "shortcut route." The valets would exit the Olive 8 parking garage driveway on Eighth Avenue, drive eastbound across the two one-way northbound lanes of traffic to a parking lot located across the street, turn right into an alley, and turn right on Pine Street.

At approximately 4:00 p.m. on October 8, 2012, Warn retrieved the Toyota Avalon of a Grand Hyatt hotel guest from the Olive 8 garage. It was a dry, bright sunny day. Warn drove the Toyota across Eighth Avenue toward the parking lot. Forty-seven-year-old Thyce Colyn was riding his bicycle on his way home from work in the far

2

northbound lane on Eighth Avenue. The Toyota collided with the bicycle. Thyce[1] hit the hood of the car and landed on the ground. After the collision, Warn moved the car. There was "an indentation on the hood of the vehicle" and the right headlight was "completely shattered."

Seattle Police Officer Joseph Belfiore responded to the 911 call. Officer Belfiore was the investigating officer in charge of interviewing witnesses, collecting evidence, and preparing a "Traffic Collision Report." Officer Belfiore contacted medics and spoke to Warn. An in-car "dash cam" recorded the conversation with Warn. Warn told Officer Belfiore that before the collision, he was looking to the right toward oncoming traffic, but then something "caught his eye" and he was looking "left" when the collision occurred.

The force of the collision bent the front tire of the bicycle, cracked the bicycle frame near the left pedal, and cracked Thyce's bicycle helmet. The leather on the left bicycle handle was ripped and unraveled.

Thyce suffered "high energy" traumatic injuries from the force of the collision. His acetabular hip socket was broken, his pelvic bone was "shattered," the rotator cuff in his right shoulder was damaged, and he suffered traumatic brain injury. Thyce underwent a number of surgeries during a lengthy stay at Harborview Medical Center. In order to repair the pelvic bone, the lateral femoral cutaneous nerve had to be severed and permanent hardware installed. After his release from Harborview, Thyce spent approximately 55 days in an inpatient rehabilitation center.

At first, Thyce could not walk. Thyce uses a wheelchair. After four years of physical therapy, Thyce can walk with the assistance of forearm crutches or a walker. It takes "a lot of effort" for him to walk.

---

[1] We refer to Thyce Colyn by his first name for clarity.

Thyce is a "high risk patient" for hip replacement because of the surgeries to repair his pelvis. The "[b]est case scenario would be that he would be able to walk around half to . . . one full revolution . . . around the track. . . . [W]hich is about a quarter mile."

Thyce suffers from severe chronic headaches and is in constant pain from his hip, pelvis, and damaged nerve. Thyce has cognitive impairment, tinnitus, and sensitivity to light as a result of the traumatic brain injury. Thyce is no longer able to recreate complex visual images. Thyce was diagnosed with depression, anxiety, and post-traumatic stress disorder.

Before the collision, Thyce was an expert in complex traffic signal maintenance and computer systems. With accommodation for his disabilities, Thyce was able to return to work at the Seattle Department of Transportation for approximately four hours a day. Thyce could no longer perform complex tasks. When he returns home from work, Thyce is exhausted and depressed. If Thyce were "not able to continue to work at the City of Seattle[,] . . . he's probably unemployable."

Thyce and his spouse Amy Colyn traveled and frequently rode their tandem bicycle, "around 40,000" miles. After the collision, their relationship changed from "husband and wife" to patient and caregiver. Amy[2] works fulltime and is the primary caregiver.

On July 14, 2015, Thyce and Amy (collectively, Colyn) filed a personal injury complaint for damages against Standard Parking and Warn. The complaint alleged Thyce had the right-of-way, Warn "failed to yield the right of way to [Thyce] and struck him in Mr. Colyn's lane," and Warn was acting "within the course and scope of his

---

[2] We refer to Amy Colyn by her first name for clarity.

4

employment" with Standard Parking when he hit Thyce. The complaint alleged Warn admitted he was looking the other way and did not see Thyce before hitting him with the Toyota. "Warn told the investigating police officer that he did not see [Thyce] because he (Defendant Warn) was looking north, away from oncoming traffic, as he (Warn) was crossing 8th Avenue." The complaint alleged the police cited Warn for failing to yield the right-of-way to "bicyclists when emerging from an alley, driveway or building, as necessary to avoid a collision, in violation of Seattle Municipal Code 11.58.230 and RCW 46.61.365." The complaint attached a copy of the Seattle Municipal Court "Agreement to Defer Finding on Traffic Infraction." The agreement states Warn admits he committed the traffic violation. Colyn alleged Standard Parking did not properly train or supervise Warn and the "practice of short cutting across 8th Avenue to save time created an unnecessary and unreasonable risk of harm to cyclists, motorists and pedestrians travelling on 8th Avenue."

Warn and Standard Parking each filed an answer and asserted affirmative defenses. Warn admits he told the police he "did not see Mr. Colyn" but denies he "failed to yield the right of way" to Thyce or "struck him in Mr. Colyn's lane." Warn asserted as an affirmative defense that "damages may have resulted from plaintiffs' own failure to exercise ordinary care or by their own negligence and recklessness" and "[p]laintiffs may have failed to mitigate, minimize, or avoid the damages."

Standard Parking admitted Warn "was employed by Standard Parking and was operating a hotel patron's vehicle at the time of the collision." Standard Parking asserted as an affirmative defense that the "alleged damages may have resulted from plaintiffs' own failure to exercise ordinary care or by their own negligence and

5

recklessness" and that "[p]laintiffs may have failed to mitigate, minimize, or avoid the damages allegedly sustained and their recovery, if any, should be reduced appropriately."

The eight-day jury trial began on November 28, 2016. Colyn called more than 15 witnesses to testify, including Seattle Department of Transportation supervisors, Officer Belfiore, former Standard Parking manager Sean Curry, primary care physician Dr. Joan Olson, orthopedic surgeon Dr. Jonathan Clabeaux, physical medicine and rehabilitation specialists Dr. Andrew Friedman and Dr. Jared Olson, physical therapist Dr. Catherine Nutting, neurologist Dr. Braden Nago, clinical psychologist Dr. Jeffrey Sherman, vocational rehabilitation and case manager Anthony Choppa, and economist Dr. Christina Tapia.

Seattle Department of Transportation supervisors testified about the work Thyce performed before the collision and his struggle after the collision to perform tasks—"he's certainly . . . not the same man as he was before." Thyce was "a lot slower mentally" and could "only handle the simplest task."

With assistance, Thyce walked to the witness stand and testified about the life he and Amy had before the collision and how "now Amy's been thrust into the role of a caretaker" with no "time for visiting her friends or family." Amy testified about the logistics of caring for Thyce. Amy testified Thyce is "in constant pain" and "very, very sad."

At the close of the plaintiffs' case, Standard Parking and Warn (collectively, Standard Parking) filed a CR 50 motion for judgment as a matter of law. Standard Parking argued Colyn did not prove the elements of negligence or wage and economic

loss. The court denied the motion.

Standard Parking called more than 10 witnesses to testify, including Warn, accident reconstruction expert John Hunter, orthopedic surgeon Dr. Stanley Kopp, neuropsychologists Dr. Gina Formea and Dr. Alan Breen, psychologist Dr. Gerald Rosen, neurologist Dr. Roman Kutsy, psychiatrist Dr. Kevin Berry, and certified public accountant and forensic economist William Partin.

At the conclusion of the evidence, Colyn moved for judgment as a matter of law on the negligence of Warn, the liability of Standard Parking, and the affirmative defense of contributory negligence. Colyn argued there was no evidence to support finding Warn yielded the right-of-way to Thyce. Colyn argued Standard Parking did not present evidence that would support finding Thyce was contributorially negligent for the collision. Standard Parking argued the issues of fault and contributory negligence should be submitted to the jury.

The court asked the Standard Parking attorney to "point out to me what evidence there is of failure to use reasonable care on the part of Mr. Colyn specifically." The attorney argued, "It was a bright, sunny day; it's a street that is controlled by a traffic light; and the side profile of this vehicle was 16 1/2 feet." The attorney stated, "[T]he car is perpendicular, and we've admitted to the fact that it was perpendicular." The attorney argued, "[E]veryone using a public roadway must exercise ordinary care to avoid placing himself or others in danger and avoid a collision."

The court reiterated, "But, again, where's the evidence that he didn't" use reasonable care.

> [DEFENSE COUNSEL]: Well, first of all, how about the testimony from Mr. Warn? Mr. Warn's testimony is completely uncontradicted, and

he says he was stopped for three seconds.

THE COURT: Right.

[DEFENSE COUNSEL]: Three seconds is long enough. That is the amount of time for a yellow stoplight. That is long enough for an approaching vehicle, be that a bicycle, or be that a car, to recognize something is there and stop. It's why yellow stoplights are three seconds. We know that drivers — and consistent with Mr. Hunter's testimony — can recognize something and stop in three seconds.

Mr. Colyn presented no evidence to rebut Mr. Warn's testimony that he was stopped for three seconds.

The court states, "I didn't hear Mr. Hunter testify that there was a point in time when Mr. Colyn would have, could have, or should have seen the car and had enough time to stop." The Standard Parking attorney agreed "we don't know exactly where" Thyce was before or after the collision.

I believe [Hunter] acknowledges that we don't know exactly where Mr. Colyn was. He could have been as far back as the intersection. He could have been across the intersection. We don't know because he refused to testify about the accident.

The court granted the motion for judgment as a matter of law. The court ruled Warn breached his duty of care by not yielding the right-of-way to Thyce as the favored driver. The court ruled Standard Parking did not meet the burden of proving Thyce was contributorially negligent.

The jury instructions state the negligence of Warn and Standard Parking as his employer has been established as a matter of law. Jury instruction 7 states:

You do not need to decide whether defendant Taylor Warn was negligent or whether he was acting within the scope of his employment with defendant Standard Parking. Mr. Warn's negligence has been established as a matter of law. Standard Parking is in turn liable for the negligence of its employee Taylor Warn.

You are to decide what injuries and damages to plaintiffs were proximately caused by the defendants' negligence and what amount plaintiffs should recover. The plaintiffs have the burden of proof on these issues.

The jury instructions state Thyce was not negligent as a matter of law. Jury instruction 8 states, "You do not need to decide whether plaintiff Thyce Colyn was negligent with regard to the collision. It has been established that he was not."

The jury found the "proximate cause of injury or damage to the plaintiffs" was the negligence of Warn and Standard Parking. The jury awarded Thyce $7,259,238 for past and future economic damages, $4 million for past noneconomic damages, and $16 million for future noneconomic damages. The jury awarded Amy $11 million for past and future loss of consortium.

Standard Parking filed a CR 50(b) motion for judgment as a matter of law and in the alternative, remittitur or a new trial. The court denied the motion. The court entered judgment on the jury verdict.

## ANALYSIS

### Judgment as a Matter of Law on Negligence and Contributory Negligence

Standard Parking contends the court erred in granting Colyn's motion for judgment as a matter of law, ruling Warn breached the standard of care and Standard Parking did not present evidence to show contributory negligence.

We review a decision on a motion for judgment as a matter of law de novo, applying the same standard as the trial court. Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 915, 32 P.3d 250 (2001); Sing v. John L. Scott, Inc., 134 Wn.2d 24, 29, 948 P.2d 816 (1997). Judgment as a matter of law is appropriate when "viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party." Sing, 134 Wn.2d at 29; see CR 50(a)(1). Substantial evidence is a

"sufficient quantum to persuade a fair-minded, rational person of the truth of a declared premise." Helman v. Sacred Heart Hosp., 62 Wn.2d 136, 147, 381 P.2d 605 (1963); Davis v. Microsoft Corp., 149 Wn.2d 521, 531, 70 P.3d 126 (2003).

Negligence

There is no dispute Warn had a duty to "yield the right-of-way" to all approaching vehicles while driving from the Olive 8 garage to the parking lot across the two lanes of traffic on northbound Eighth Avenue. RCW 46.61.365. RCW 46.61.365 states:

> The driver of a vehicle within a business or residence district emerging from an alley, driveway or building shall stop such vehicle immediately prior to driving onto a sidewalk or onto the sidewalk area extending across any alleyway or driveway, and shall yield the right-of-way to any pedestrian as may be necessary to avoid collision, and upon entering the roadway shall yield the right-of-way to all vehicles approaching on said roadway.

The driver with the right-of-way is considered the favored driver and the disfavored driver must yield the right-of-way to the favored driver. RCW 46.61.365; Bowers v. Marzano, 170 Wn. App. 498, 506, 290 P.3d 134 (2012). The disfavored driver has a "duty to stop, observe all traffic upon the arterial and yield the right of way to all traffic moving in either direction." Petersavage v. Bock, 72 Wn.2d 1, 4-5, 431 P.2d 603 (1967). The disfavored driver bears "the primary duty to avoid a collision." Sanchez v. Haddix, 95 Wn.2d 593, 597, 627 P.2d 1312 (1981). There is no dispute that as a matter of law, Warn was the disfavored driver and Thyce was the favored driver.

Standard Parking contends the jury could have found Warn was not negligent. Standard Parking asserts that viewing the evidence in the light most favorable to the nonmoving party, substantial evidence would support the jury finding Warn did not breach the duty to yield to the bicycle. We disagree.

10

Officer Belfiore testified that Warn admitted he was looking southbound to the left and not northbound toward oncoming vehicles when he collided with Thyce:

> [Warn] stated he was leaving the Olive 8 hotel parking lot. After a car passed along 8th Avenue, which is a one-way road, he started to proceed directly across the street to the parking lot that was on the opposite side of the road.
>
> Mr. Warn stated to me that he had looked left because there was something that had caught his eye. And then the next thing he knew, the collision happened with Mr. Thyce, the bicyclist.
>
> Q.   Did Mr. Warn explain to you at the time as to whether he hit the bicyclist or the bicyclist hit him?
>
> A.   He admitted — he stated to me that he had collided into the bicyclist.
>
> Q.   Did he ever say to you during the time that you were there that he stopped and was yielding for pedestrians?
>
> A.   No. The only mention of a vehicle coming south was when he waited for that one car that was traveling along 8th Avenue to pass.
>
> Q.   Would that have been in the inside lane?
>
> A.   Yes. That would be the lane closest to the Olive 8 hotel, so the west northbound lane.
>
> Q.   Now, you've listened to the video, the dash cam video, the part about the admissions several times; is that right?
>
> A.   Yes.
>
> Q.   And is what you can decipher from that consistent with what your memory was of what you were told?
>
> A.   Yes.

Officer Belfiore testified the damage to the Toyota is consistent with the car crossing Eighth Avenue and hitting the bicycle going northbound:

> Q.   (By [Plaintiffs' counsel]) Tell the jury — go ahead — where did you find the damage to the vehicle?
>
> A.   The damage to the vehicle was on the front — if — here's the front side of the vehicle. This would be on the driver's side. This would be on the passenger side. It was approximately right over here, consistent with the vehicle hitting into an object as the vehicle was crossing 8th Avenue and Mr. Colyn coming northbound on 8th Avenue, it would look approximately like that; my left hand being the vehicle, my right-hand being the bicycle.

Officer Belfiore prepared a Traffic Collision Report and drew a diagram "based upon [his] conversations with" Warn. At trial, Officer Belfiore testified that he mistakenly labeled the bicycle as colliding with the car instead of the car colliding with the bicycle.

The court admitted and Colyn's counsel played the police car dashboard camera video and audio recording of the conversation between Officer Belfiore and Warn. Warn did not dispute Officer Belfiore's account of what he told the police.

Nonetheless, Standard Parking claims that because Warn had the right-of-way when he began crossing the two lanes of traffic and had to stop for two to three seconds to let pedestrians walk across the sidewalk in front of the parking lot, a jury could have concluded Warn did not breach the duty to yield to the bicycle. Standard Parking also cites the testimony of accident reconstruction expert Hunter that the physical evidence was consistent with the bicycle hitting the car. Neither Warn's testimony that he stopped before the car moved forward nor Hunter's testimony contradicts the undisputed admission that Warn did not look in the direction of oncoming traffic and breached the duty to yield to the bicycle that had the right-of-way.

Warn testified that as he was leaving "the front drive" of Olive 8," he "stopped before that sidewalk to allow for pedestrians" to pass. "[O]nce the pedestrians had cleared the path, I was able to take my foot off the brake" and "let the transmission of the automatic car kind of slowly roll" forward onto the sidewalk. Before driving across the one-way two-lane street, Warn said he stopped "to assess" the "flow of traffic" on Eighth Avenue and saw "two vehicles traveling northbound." Warn testified that after the two vehicles drove past him, he "did not see any more vehicles or — or anything of the sort in the flow of traffic heading my direction."

Warn testified that he "beg[a]n to allow the vehicle to roll . . . into the street again just by taking my foot off the brake." Warn said the automatic transmission was "actively pulling the car forward." As the car moved across Eighth Avenue toward the parking lot, Warn noticed "a group of pedestrians on the other side of the street on the sidewalk heading southbound." Warn testified that he "put the brakes on" to "facilitate . . . their right-of-way" and "allow the vehicle to remain stopped while allowing the pedestrians to . . . make their way across the sidewalk." Warn testified that after two or three seconds, he took his foot off the break to continue to move forward to the parking lot, when he heard "a loud bang."

> And then possibly two, maybe three seconds at most go by as I'm waiting there letting the pedestrians finish up their scurrying across, and at that moment is when I took my foot off the brake to allow my — the vehicle to continue moving towards my desired destination of that parking lot. And as I'm taking my foot off the brake is when I heard a loud bang sound, if you will. Maybe "bang" is not the right word to describe what it was, but that's the best way I can articulate it at this point. And it came from the right-hand side of the vehicle and — or maybe I suggest that because I heard it most clearly from my right ear rather than my left.

Warn testified he saw "a flash" of a figure with a bicycle helmet going over the hood of the Toyota.

> I saw what — kind of just a flash of a figure coming across the hood of my vehicle, and it seemed as if it had bounced off the hood and — and slid on the ground probably another few feet before it came to a rest. And at that point I realized it was a human and it was a cyclist, as the gentleman was wearing a bicycle helmet, and at that point I became to — began to realize the — the severity of the situation and began to fill with emotions.

Warn testified he "immediately stopped" and got out of the car to assist the bicyclist but "realized that there was nothing that I could do." Warn returned to the car because "I'm also realizing that I kind of had a vehicle parked just in the middle of the road. So I returned to the car, got in, continued to move the car out of the road and into

the parking lot." Warn testified that when he first got out of the car and when he returned to the car, he saw the bicycle was south of the car and on the right side.

Warn admitted he told the police officers he did not see the man on the bicycle because he was looking to the left instead of the right. Warn testified looking "[l]eft would be away from where the cars were coming from." Warn conceded Thyce had the right-of-way and he had the duty to yield to a bicycle traveling northbound on Eighth Avenue.

Accident reconstruction expert John Hunter testified that in his opinion, "[t]he leading edge of the bike was hit." Hunter concluded the physical evidence was consistent with his opinion that the bicycle hit the Toyota.

> I think that the bicycle interacted with the right-front corner of the car. And it did it with its leading edge, which is the tire. And possibly right where the frame starts to get bent that — that corner of the bike is not completely in front of the car, but it's trying to get there. And it's more of a sideswiping-type impact. And you have a dent to the hood of the car that's consistent with the rider interacting with the hood. . . . Just because the damage patterns that we have are a sideswiping-type impact, and [Thyce] doesn't interact with that parked car. He gets blasted off to the right, and he ends up underneath the parked car.

But even if the testimony that the bicycle hit the car is accurate, the uncontroverted evidence established Warn breached the duty to yield by not looking in the direction of the oncoming traffic when he removed his foot from the brake and the automatic transmission moved the car forward. The undisputed evidence established Warn was looking left at the time of the collision and did not yield the right-of-way to Thyce, the favored driver. The court did not err by concluding as a matter of law that

Warn breached the duty to yield the right-of-way.[3]

Contributory Negligence

Standard Parking contends the court erred in ruling as a matter of law that Thyce was not negligent. Standard Parking contends the evidence supports a jury finding that Thyce was contributorily negligent.

Standard Parking asserted contributory negligence as an affirmative defense and had the burden of proving Thyce was negligent by a preponderance of the evidence. Cox v. Spangler, 141 Wn.2d 431, 447, 5 P.3d 1265 (2000); Hart v. Clapp, 185 Wash. 362, 363, 54 P.2d 1012 (1936).

While the disfavored driver bears the primary duty to avoid a collision, the "rule of the road right of way is relative rather than absolute" and "does not absolve" a favored driver "from the duty to exercise due care." Cox v. Kirch, 12 Wn.2d 678, 682, 123 P.2d 328 (1942); Sanchez, 95 Wn.2d at 597.

The driver with the right-of-way has the right "to assume that cars entering upon [the roadway] will yield the right of way, and he is not obliged to anticipate that vehicles standing or approaching to enter will fail to yield the right of way." Petersavage, 72 Wn.2d at 5. However, when it becomes apparent to the favored driver that the disfavored driver "will not yield," the favored driver must "react concerning this possible danger." Petersavage, 72 Wn.2d at 5-6.

> When, in the exercise of reasonable care, it becomes apparent to
> the favored driver that the disfavored driver will not yield the right of way,

---

[3] Standard Parking cites Lanegan v. Crauford, 49 Wn.2d 562, 304 P.2d 953 (1956), to argue Warn was entitled to deference from other vehicles until he cleared the road. We do not consider a theory that was not presented to the trial court. RAP 2.5(a); Cole v. Harveyland, LLC, 163 Wn. App. 199, 204, 258 P.3d 70 (2011). We note that Standard Parking concedes it is not invoking the "sudden-emergency doctrine" under Lanegan.

the favored driver is, nevertheless, still entitled to a reasonable reaction time before he can be charged with contributory negligence.

Petersavage, 72 Wn.2d at 6.

As the favored driver, Thyce was entitled to rely on the reasonable expectation that Warn would yield the right-of-way until he reached the "point of notice." Channel v. Mills, 77 Wn. App. 268, 278-79, 890 P.2d 535 (1995); Whitchurch v. McBride, 63 Wn. App. 272, 276, 818 P.2d 622 (1991).

> [T]he favored driver is entitled to rely on the disfavored driver's yielding the right of way until the favored driver reaches that point at which a reasonable person exercising reasonable care would realize that the disfavored driver is not going to yield. It is from and after that point that a reasonable person's hypothetical conduct is compared with the favored driver's actual conduct in order to determine whether there is evidence sufficient to support a verdict that the accident would not have happened but for the favored driver's negligence. If there is no evidence showing the approximate location of that point, the reasonable person's conduct cannot be compared with the favored driver's, and the plaintiff has not borne the burden of producing evidence sufficient to support a finding that the accident would not have happened but for the favored driver's negligence.

Whitchurch, 63 Wn. App. at 276-77.[4] The "point of notice" is "that point at which a reasonable person exercising reasonable care would realize that the disfavored driver is not going to yield." Whitchurch, 63 Wn. App. at 276.

To show proximate cause, the party asserting contributory negligence must "produce evidence from which the trier of fact can infer the favored driver's approximate point of notice." Bowers, 170 Wn. App. at 506 (citing Channel, 77 Wn. App. at 279). The favored driver is entitled to judgment as a matter of law if the disfavored driver cannot establish the approximate point of notice. Bowers, 170 Wn. App. at 507; Whitchurch, 63 Wn. App. at 276-77. Standard Parking had the burden to prove that

---

[4] Footnotes omitted; citations omitted.

"between the point of notice and the point of impact," Thyce "would have been able to brake, swerve or otherwise avoid the point of impact." Channel, 77 Wn. App. at 278-79. Standard Parking must produce "evidence showing the approximate location" of the point where Thyce "would have perceived danger." Whitchurch, 63 Wn. App. at 276-77; Channel, 77 Wn. App. at 278-79. Standard Parking must show Thyce could have "stopped or otherwise avoided the collision" after passing the point of notice. Channel, 77 Wn. App. at 274-75.

Before trial, Colyn filed a motion in limine to exclude Hunter from testifying that a higher standard of care requires bicyclists to yield the right-of-way and avoid a collision. Colyn argued a higher standard of care for bicyclists is contrary to Washington law.

In his deposition, Hunter testified Thyce was not speeding and had the right-of-way. Hunter admits he does not know the point of notice where it was clear Warn was not going to yield the right-of-way or the point of impact. But Hunter testified that because bicyclists are not "conspicuous" and "do not . . . present much of a frontal profile," bicyclists must assume other drivers "are going to violate your right-of-way when you are riding a bicycle."

The court granted the motion in limine on the standard of care. The court ruled, "Mr. Hunter may testify as to his mathematical calculations pertaining to, e.g., stopping distances. He may not testify as to fault, or standards of care at odds with Washington law."

At trial, Hunter testified that after reviewing the Traffic Collision Report, the police car dashboard video, the deposition of Warn, the deposition of Thyce, and photographs of the bicycle and the car, in his opinion, the bicycle hit the Toyota.

17

Consistent with his deposition testimony, Hunter testified he did not know the point of notice or the point of impact. Hunter testified Thyce was not speeding and he did not know "what [Thyce] was doing" before the collision.

Q. So if [Thyce is] pacing traffic and traffic is going the speed limit, it could be as much as 30 miles an hour?
A. Right, but his impact speed is not going to be any faster than that. It just can't be based on the limited — I looked at — tried figuring out speed, and I looked at the physical evidence that we have and there's no way he's going faster than 30 at the time of impact.
Q. And why do you say that?
A. Just because the damage patterns that we have are a sideswiping-type impact, and he doesn't interact with that parked car. He gets blasted off to the right, and he ends up underneath the parked car. And there's no evidence that he interacted with this parked car. So there's a limited distance he can travel postcollision — like in our HVE[5] model, postcollision, how far did he go. And because you're limiting that distance, therefore you're limiting the speed that he's going.
    And I just, for the life of me, can't suggest that he was exceeding the speed limit at any time at impact. Now, I can't tell you what he was doing before that. It just depends on whether he brakes efficiently or not, or whatever happens before that. Obviously, he could scrub off some speed. But at impact, there's no way he's going faster than [the posted speed limit of] 30 [miles an hour].

Hunter testified that in his deposition, Thyce testified that he did not "notice" the Toyota "until just before the collision." Hunter testified Thyce said he "caught something from his eye to his left, and then there was the collision, and he attempted to brake." But as Hunter stated, he calculated the distances to brake but did not calculate "times." Hunter testified Thyce "was pacing traffic" but did not know his speed. Hunter testified there was "no way" Thyce was "going faster than 30 at the time of impact." Hunter did not testify how many feet-per-second a 20-mile-per-hour bicycle would travel.

---

5 Human, vehicle, and environment.

18

During cross-examination, Hunter testified there would not be sufficient "perception-reaction time" to brake. According to Hunter, perception-reaction time is the time it takes to "perceive, decide and react."

> Q. So if we were to use — let's use your 30 miles an hour — and at 2.5 seconds, how much distance would you travel at 30 miles an hour?
>
> A. Well, 30 miles an hour is 44.1, but let's just say 44 feet per second at 2.5 seconds?
>
> Q. Yes.
>
> A. You'd cover about 110 feet.
>
> Q. And then on top of that, if you were to brake, you'd have about another, what, 43 feet, then, to brake?
>
> A. Well, if you waited that long to brake, yes. You'd have to then decelerate at 30 miles an hour to get to a stop. At full brake force, it would take 43 feet.
>
> Q. It takes all 43 plus 110 is about 153 feet total to perceive —
>
> A. Right.
>
> Q. — decide, react. That would put you about — back at the intersection, right?
>
> A. I'm not sure what that distance is, but that's an awful late perception-reaction time.

Standard Parking argues Thyce had enough time to brake before colliding with the Toyota because Warn testified he stopped for 2 or 3 seconds to wait for pedestrians on the sidewalk. Hunter testified the perception-reaction time is between 2.5 and 12 seconds. Standard Parking relies on a calculation of placing Thyce 155 feet away from the Toyota to argue Thyce only "needed 92.33 feet to perceive Warn's vehicle, react, and stop." Standard Parking argues Colyn's attorney conceded Thyce was 155 feet away from the Toyota. The record does not support Standard Parking's argument.

Standard Parking's assertion that Colyn's attorney conceded Thyce was 155 feet from the Toyota is based on a hypothetical that Colyn's counsel posed during argument

on the motion for judgment as a matter of law on contributory negligence. Colyn's attorney argued, in pertinent part:

> They don't have a point of notice, they don't have a point of impact, and they don't even have a reasonable reaction time between those two spots that would say that had [Thyce] done something different or reacted within a reasonable period of time, which is anywhere from 2.5 to 4 seconds by case law. Mr. Hunter also admitted on the 2.5 seconds is the AASHTO [(American Association of State Highway and Transportation Officials)], the Federal AASHTO standards for reasonable reaction time. And had they even put those together, he would have been 155 feet back, which puts him in the intersection, so we think as a matter of law, [contributory negligence] is not available under the facts of this case.

Because substantial evidence does not support the jury finding the point of notice and the point of impact and that Thyce could have avoided the collision, the court did not err in ruling Thyce was not contributorially negligent as a matter of law.[6]

Evidentiary Rulings and Denial of Motion for a Mistrial

Standard Parking contends the court erred by overruling the objection to expert testimony that Warn had a duty to yield and denying the motion for a mistrial based on the impeachment of Hunter under ER 608(b). We review evidentiary rulings for abuse of discretion. Hollins v. Zbaraschuk, 200 Wn. App. 578, 582, 402 P.3d 907 (2017), review denied, 189 Wn.2d 1042, 409 P.3d 1061 (2018). We review a trial court's decision to deny a motion for mistrial for abuse of discretion. Adkins v. Alum. Co. of Am., 110 Wn.2d 128, 137, 750 P.2d 1257, 756 P.2d 142 (1988); Kimball v. Otis Elevator Co., 89 Wn. App. 169, 178, 947 P.2d 1275 (1997).

---

[6] Because we conclude the court did not err in ruling as a matter of law that Warn was negligent and Thyce was not negligent, we need not address whether the trial court should have dismissed the independent negligence claims against Standard Parking. Ashley v. Hall, 138 Wn.2d 151, 161, 978 P.2d 1055 (1999). There is no dispute Standard Parking is vicariously liable for Warn's failure to use reasonable care.

On cross-examination, Colyn's attorney asked Hunter about the duty to yield:

Q.    Mr. Warn had the duty to yield the right of way to Mr. Colyn, correct?

A.    Yes.

[DEFENSE COUNSEL]:    Objection; calls for a legal conclusion.

THE COURT:    Overruled.

A.    Yes.

Q.    Your evaluation is Mr. Warn did not yield the right of way to Mr. Colyn, correct?

A.    That's correct.

The existence of a duty is a question of law. Martini v. State, 121 Wn. App. 150, 160, 89 P.3d 250 (2004) (citing Degel v. Majestic Mobile Manor, Inc., 129 Wn.2d 43, 48, 914 P.2d 728 (1996)). The erroneous admission of evidence merits reversal only if the error prejudiced the party opposing the admission of the evidence. Brown v. Spokane County Fire Prot. Dist. No. 1, 100 Wn.2d 188, 196, 668 P.2d 571 (1983). The improper admission of evidence constitutes harmless error if the evidence is cumulative. Brown, 100 Wn.2d at 196. Hunter's testimony was cumulative of Warn's testimony that he had a duty to "yield to bikes coming down the road," making any error harmless.[7]

Standard Parking contends the court erred by allowing Colyn's attorney to impeach Hunter with ER 608(b) evidence and denying its motion for a mistrial. A party may not use extrinsic evidence to prove specific instances of conduct relating to credibility. ER 608(b). However, in the discretion of the court, a party may inquire into specific instances of conduct "on cross examination of the witness . . . concerning the witness' character for truthfulness or untruthfulness." ER 608(b)(1).

---

[7] Any error was also harmless because the court did not err in ruling Warn breached the duty to yield the right-of-way.

21

In a 2008 lawsuit, <u>Gullette v. Cole</u>, Kitsap County Superior Court No. 08-2-01132-3, the defendant retained Hunter to investigate a motor vehicle accident and testify at trial. Hunter submitted two declarations to the court under penalty of perjury stating that he "visited the accident scene" and that his opinions were "based upon my personal knowledge." After a discovery request for the case log and "Scene Inspection Record," Hunter filed a supplemental declaration stating he had not visited the accident scene. The court in <u>Gullette</u> granted plaintiff's motion to exclude Hunter from testifying because he was not credible:

> The Court holds that John Hunter's original and supplemental declarations, certified to be true under penalty of perjury, were not based upon his personal observations at the scene of the accident. Mr. Hunter's second supplemental declaration, which attempts to reaffirm the factual bases contained in his previous declarations, was submitted in violation of the case event schedule which set February 17, 2009 as the last day to complete discovery. In any event, an additional declaration from Mr. Hunter does nothing to rehabilitate the credibility of Mr. Hunter in the eyes of the Court. . . . Due to concerns of the Court regarding credibility, John Hunter will not be permitted to testify at trial.

On cross-examination, Colyn's attorney asked Hunter whether he had "been barred for lying to a court before." Standard Parking argued the ruling in <u>Gullette</u> "from a number of years ago" was not relevant and Colyn's attorney mischaracterized the ruling as "perjury." Standard Parking moved for a mistrial, arguing Hunter's "reputation cannot be cleared in front of this jury." In opposition, Colyn argued, "Credibility is always at issue when someone's asking the jury to believe their opinions" and the previous court ruling was relevant.

The court ruled <u>Gullette</u> was relevant. The court ruled that under ER 608(b), the "question about a specific instance of conduct" was probative of Hunter's truthfulness.

The court denied the motion for a mistrial. The court did not abuse its discretion in allowing impeachment under ER 608(b) and denying the motion for a mistrial.

Motion for New Trial

Standard Parking seeks reversal and remand for a new trial. Standard Parking claims the trial court abused its discretion in denying its motion for a new trial on the grounds of prejudicial attorney misconduct.

We review the court's decision on a motion for a new trial for abuse of discretion. Teter v. Deck, 174 Wn.2d 207, 215, 274 P.3d 336 (2012). A much stronger showing of abuse of discretion is required to set aside an order granting a new trial than an order denying a new trial because denial of a new trial " 'concludes [the parties'] rights.' " Palmer v. Jensen, 132 Wn.2d 193, 197, 937 P.2d 597 (1997)[8] (quoting Baxter v. Greyhound Corp., 65 Wn.2d 421, 437, 397 P.2d 857 (1964)); Teter, 174 Wn.2d at 215. A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Teter, 174 Wn.2d at 215. A trial court should grant a new trial if the impact of the misconduct on the jury was so prejudicial that it denied Standard Parking a fair trial. Moore v. Smith, 89 Wn.2d 932, 942, 578 P.2d 26 (1978).

A party seeking a new trial based on attorney misconduct must establish (1) the conduct constitutes misconduct as distinct from aggressive advocacy, (2) the misconduct is prejudicial in the context of the entire record, (3) the misconduct was objected to and curative instructions requested, and (4) prejudice was not cured by the instructions to the jury. Teter, 174 Wn.2d at 226; Alum. Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wn.2d 517, 539, 998 P.2d 856 (2000). In reviewing the trial court's decision,

---

[8] Alteration in original.

23

we consider whether " 'such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial.' " Alum. Co. of Am., 140 Wn.2d at 537[9] (quoting Moore, 89 Wn.2d at 942). The trial court is in the best position to most effectively determine prejudice and whether attorney misconduct prevented a fair trial. Miller v. Kenny, 180 Wn. App. 772, 815, 325 P.3d 278 (2014).

Standard Parking attaches an appendix to their brief that identifies more than 300 objections and the rulings on the objections during the eight-day trial. Standard Parking cites the court's admonishment on the sixth day of trial to argue the court did not understand the scope of the misconduct. The record does not support Standard Parking's argument.

After ruling Colyn's attorney could impeach Hunter under ER 608(b) and denying the motion for mistrial, the court admonished Colyn's counsel for "vouching" and commenting on the credibility of witnesses by using the word "lies." The court admonished defense counsel for not objecting. The court stated:

> In general, [plaintiffs' counsel], you have a number of times made comments about the credibility of witnesses and used the word "lies" in such a way that you are inappropriately commenting on the credibility of witnesses and vouching, and I want that to stop.
> There are so many times in this case where there have been inappropriate questions and characterizations and testimony from you, but I'm not getting objections from the defense. So my hands are tied.
> I would encourage you, [defense counsel], to begin objecting to those things because there have been so many objectionable questions in this case, and there has been so much testimony by [plaintiffs' counsel]. Feel free to object.

The record shows defense counsel previously made a number of objections on the grounds of lack of foundation or asking leading questions. But when the court sustained an objection to lack of foundation, Colyn's attorney rephrased the question

---

[9] Internal quotation marks omitted.

and without objection, the witness answered. Likewise, when the court sustained the objection to asking a leading question, the attorney rephrased the question. See Bristol v. Streibich, 24 Wn.2d 657, 658, 167 P.2d 125 (1946) (sustaining objections to leading questions is, as a general rule, not a ground for reversal). The record shows that after the court admonished the attorneys, the number of objections made by the Standard Parking attorney increased but the court did not sustain a number of the objections.

Further, the court specifically instructed the jury to disregard the objections and comments of counsel:

> One of my duties has been to rule on the admissibility of evidence. Do not be concerned during your deliberations about the reasons for my rulings on the evidence. If I have ruled that any evidence is inadmissible, or if I have asked you to disregard any evidence, then you must not discuss that evidence during your deliberations or consider it in reaching your verdict.
>
> The law does not permit me to comment on the evidence in any way. I would be commenting on the evidence if I indicated my personal opinion about the value of testimony or other evidence. Although I have not intentionally done so, if it appears to you that I have indicated my personal opinion, either during trial or in giving these instructions, you must disregard it entirely.
>
> As to the comments of the lawyers during this trial, they are intended to help you understand the evidence and apply the law. However, it is important for you to remember that the lawyers' remarks, statements, and arguments are not evidence. You should disregard any remark, statement, or argument that is not supported by the evidence or the law as I have explained it to you.
>
> You may have heard objections made by the lawyers during trial. Each party has the right to object to questions asked by another lawyer, and may have a duty to do so. These objections should not influence you. Do not make any assumptions or draw any conclusions based on a lawyer's objections.
>
> As jurors, you have a duty to consult with one another and to deliberate with the intention of reaching a verdict. Each of you must decide the case for yourself, but only after an impartial consideration of all of the evidence with your fellow jurors. Listen to one another carefully. In the course of your deliberations, you should not hesitate to re-examine your own views and to change your opinion based upon the evidence. You should not surrender your honest convictions about the value or

significance of evidence solely because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of obtaining enough votes for a verdict.

As jurors, you are officers of this court. You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, bias, or personal preference. To assure that all parties receive a fair trial, you must act impartially with an earnest desire to reach a proper verdict.

We presume the jury follows the court's instructions. Tincani v. Inland Empire Zoological Soc'y, 124 Wn.2d 121, 136, 875 P.2d 621 (1994).

Standard Parking contends the "most flagrant example of misconduct" was asking questions during the cross-examination of Hunter that implied Warn lied and introducing ER 608(b) evidence to impeach Hunter. The record shows Warn's testimony at trial differed significantly from what he told Officer Belfiore immediately following the collision. As previously addressed, the court did not abuse its discretion in allowing Colyn's attorney to impeach Hunter.

The case Standard Parking cites, Miller v. Staton, 64 Wn.2d 837, 394 P.2d 799 (1964), is not analogous. In Staton, the defendants' attorney told the jury the defendants did not have liability insurance. Staton, 64 Wn.2d at 840. The Washington Supreme Court held the intentional introduction of insurance coverage was irrelevant and so prejudicial, a new trial was required. Staton, 64 Wn.2d at 840-41.

We do not condone the improper questions or the conduct of Colyn's attorney but conclude the court was in the best position to decide whether the improper questions and conduct prejudiced the right to a fair trial, and the record as a whole does not support finding prejudicial misconduct.

Standard Parking also contends remarks in opening statement and during closing argument prejudiced its right to a fair trial. Standard Parking did not object during either opening statement or closing argument. The failure to object waives any error unless the remarks are so flagrant and ill-intentioned that a curative instruction could not obviate any prejudice. Wash. Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 333-34, 858 P.2d 1054 (1993).

The record shows the attorney did not commit misconduct by discussing the significance of the instructions that state Warn and Standard Parking were negligent as a matter of law and Thyce was not negligent. See Miller, 180 Wn. App. at 817. Standard Parking waived the argument that Colyn's attorney made improper comments in the opening statement. If Standard Parking had timely objected to the improper comments in opening statement, any prejudice could have been cured by an instruction to disregard the remarks.

Standard Parking also claims the award of damages is the result of the prejudicial attorney misconduct. We must view the evidence in the light most favorable to Colyn and affirm the jury verdict unless the verdict is " 'outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice.' " Collins v. Clark County Fire Dist. No. 5, 155 Wn. App. 48, 82, 231 P.3d 1211 (2010)[10] (quoting Bunch v. King County Dep't of Youth Servs., 155 Wn.2d 165, 179, 116 P.3d 381 (2005)).

We give deference and weight to "the trial court's discretion in denying a new trial on a claim of excessive damages." Physicians Ins. Exch., 122 Wn.2d at 330.

---

[10] Internal quotation marks omitted.

> The appellate court does not engage in exactly the same review as the trial court because deference and weight are also given to the trial court's discretion in denying a new trial on a claim of excessive damages. The verdict is strengthened by denial of a new trial by the trial court. While either the trial court or an appellate court has the power to reduce an award or order a new trial based on excessive damages, "appellate review is most narrow and restrained" and the appellate court "rarely exercises this power."

Physicians Ins. Exch., 122 Wn.2d at 330[11] (quoting Washburn v. Beatt Equip. Co., 120 Wn.2d 246, 269, 840 P.2d 860 (1992)).

Substantial evidence supports the award of damages. Thyce suffered life-altering and debilitating permanent injuries that have resulted in Amy assuming ongoing responsibility for Thyce as a caretaker. The trial court did not abuse its discretion in denying the motion for a new trial.

We affirm entry of the judgment on the verdict and denial of the motion for a new trial.[12]

WE CONCUR:

2019 JAN 22 AM 8:48
FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

---

[11] Footnotes omitted.

[12] Standard Parking contends the trial court erred in refusing to give its proposed special verdict form that allocated fault. Standard Parking asserts, "If this Court reverses and remands, the Court should direct" the trial court to give the special verdict form. Because we affirm, we need not address the argument. After oral argument, Standard Parking filed a statement of additional authorities. Colyn filed an answer and motion to strike. We deny the motion to strike the citation to additional case law but grant the motion to strike argument. RAP 10.8.